IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LINDA BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 8:03CV485 |
| vs. | ) | |
| | ) | MEMORANDUM |
| CITY OF OMAHA, NEBRASKA, | ) | AND ORDER |
| | ) | |
| Defendant. | ) | |

This matter is before me pursuant to 28 U.S.C. § 636 and the consent of the parties on defendant's Motion for Summary Judgment (Filing 29). Having carefully considered all the briefs and evidentiary materials submitted by the parties (Filings 29-31; 76-77; 79-80) I find that the motion should be granted.

## I.  INTRODUCTION

Plaintiff is an African-American female who has been employed by the City of Omaha as a firefighter since August 1987. In March 2002, plaintiff publicly supported the City of Omaha's affirmative action plan during a meeting of the Omaha City Council. She alleges in her Amended Complaint (Filing 14) that, due to her support of the affirmative action plan, she was subjected to retaliatory harassment on the job by Caucasian male co-employees, that this conduct constituted a hostile work environment, and that the City failed to take reasonable action to stop the unlawful harassment, retaliation and hostile environment. Plaintiff seeks relief pursuant to 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII").

The plaintiff participated in several administrative proceedings related to the pending civil rights claims, including a request for a service connected disability retirement based on stress, depression and post traumatic stress allegedly caused by the hostile working environment fostered by the City.  By stipulation, the parties agreed that the City was on notice, by virtue of the Amended Complaint and the incorporation of the NEOC charge by reference, that the plaintiff has a claim of race and or sex discrimination against the City related to its denial of plaintiff's request for a service connected disability pension.  Upon stipulation, plaintiff's claims relating to or arising out of a denial of pension benefits were dismissed without prejudice.  These claims were refiled and are now pending in *Brown, et al., v. City of Omaha*, No. 8:05CV457.

## II.  JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.  Venue in this district  is proper under 28 U.S.C. § 1391(b).

## III.  STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Gilooly v. Missouri Dep't of Health & Senior Serv.,* 421 F.3d 734, 738 (8th Cir. 2005).  "In making this determination, the function of the court is not to weigh evidence and make credibility determinations, or to attempt to determine the truth of the

-2-

matter, but is, rather, solely, to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must "look to the substantive law to determine whether an element is essential to a case, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Dulany v. Carhahan*, 132 F.3d 1234, 1237 (8th Cir. 1998) (quoting *Anderson*, 477 U.S. at 248).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact. *See Tenbarge v. Ames Taping Tool Sys., Inc.*, 128 F.3d 656, 657-58 (8th Cir. 1997). Accordingly, a party moving for summary judgment must "set forth in the brief in support of the motion for summary judgment a separate statement of each material fact as to which the moving party contends there is no genuine issue to be tried and as to each shall identify the specific document or portion thereof or discovery response or deposition testimony ... which it claims established the fact." NECivR 56.1(a).

In the face of a properly supported motion, "[t]he burden then shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997), *cert. denied*, 522 U.S. 1048 (1998) (quoting Fed. R. Civ. P. 56(e)).

-3-

A nonmoving party may not rest upon the mere allegations or denials of its pleadings, but rather, must set forth specific facts, supported by affidavits or other proper evidence, showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 153 F.3d 919, 922 (8th Cir. 1998). In this respect, the nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts;' ... [i]t must show there is sufficient evidence to support a jury verdict in [its] favor." *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 990 (8th Cir. 1998). Accordingly, the nonmoving party must "set forth in its opposing brief a separate statement of each material fact as to which it is contended there exists a genuine issue to be tried and as to each shall identify the specific document or discovery response or deposition testimony ... which it is claimed establishes the issue." NECivR 56.1(b).

## IV.  FINDINGS OF FACT

The City of Omaha has adopted an Affirmative Action Plan initiated by the Mayor's Office to assure fair treatment of minorities and females in hiring and promotional processes. By Executive Order, the Omaha Mayor has also adopted a "zero tolerance" policy against harassment and discrimination. A substantially similar Executive Order was in effect prior to 2002. The Standard Operating Procedures of the Omaha Fire Department include a similar policy against harassment and discrimination. These policies provide a number of avenues for employees to report harassment, and also outline the City's approach to investigating, punishing, and eliminating harassment.

-4-

In 2002, Omaha Mayor Mike Fahey asked the City Personnel Director, Cecil Hicks, to prepare an updated affirmative action plan continuing the City's policy of prohibiting harassment and discrimination in city government.  This plan was presented to the Omaha City Council for its consideration and approval.[1]

Plaintiff is a female African American employed as a firefighter/paramedic by the City of Omaha.  At all times material to this complaint, she held the rank of Captain.  On March 19, 2002, plaintiff spoke at an open and televised meeting of the City Council in favor of the affirmative action plan, which would apply to the Omaha Fire Department and other agencies.  As summarized, plaintiff told the City Council that the current hiring procedures, consisting of a physical agility test, written examination and structured interview, tended to favor white males in that major aspects of the hiring process were highly focused on firefighting duties.  According to the plaintiff, however, 80 to 85 percent of the fire department's calls were emergency medical calls, 12 to 13 percent were false alarms or small fires, and only two to three percent of the calls involved actual working fires.  In plaintiff's opinion, the emphasis on physical agility and firefighting skills did not reflect the actual duties of the Fire Department, and the failure to test for emergency medical aptitude had an adverse impact on female applicants.  As to the structured interview component, plaintiff asserted that the posted qualifications were misleading.  For example, applicants were advised that previous firefighting experience was not necessary; however, applicants with

---

[1]The affirmative action plan proposed by Mayor Fahey was ultimately approved by the City Council on May 21, 2002.

-5-

previous firefighting or paramedic experience received extra points during the structured interview, and in that respect were awarded points for experience that was not required. According to plaintiff, most minorities are not in a financial position to complete such training, and the fire departments in surrounding communities have been reluctant to hire women and minorities, precluding them from acquiring prior job experience and "extra points" for prior experience.

The following day, shortly after plaintiff reported to work at Station 65, she was approached by Captain David Hajek, who said he had a question about the comments she made before the City Council. Two or three other firefighters joined or observed this discussion. Plaintiff characterizes the conversation as an "interrogation," by Hajek and the other firefighters, during which Hajek used profanity and questioned her intelligence.

Hajek and the firefighters state that they merely had questions about the percentages plaintiff had quoted. During his deposition, Hajek testified that he saw plaintiff the morning of March 20, 2002, at the 7 a.m. shift change. He said, "Linda, I have a question." She said, "Okay," and sat down. Hajek then talked about how emphasis needed to be put on one way or the other. (Hajek agrees that most of the job is EMS.) Then, according to Hajek, she said "as a minority or as a woman, we don't have that same opportunity to do the paramedic schooling, we don't have opportunities to get on surrounding fire departments ..." Hajek expressed disagreement, stating, "You can't ... suggest that you change it, and then come back and say, but if you change it, we still can't do it." The conversation ended when Hajek said,

"You can't have it fucking both ways." She said, "Stop the profanity. If you want to talk to me, stop the profanity." Hajek stopped "cussing." Then she got up, and the last thing she said was, "You know, when I came to work today, I wondered who was going to have the questions for me, and I knew it would be you." Hajek replied, "Did you really, Linda? You're so smart." Then she walked away.

Captain Hajek, Firefighter Larry Pace, and Firefighter Lee Garrett were discussing the subject of affirmative action when plaintiff reported to work the morning of March 21, 2002. There is conflicting evidence about the nature and tenor of their discussion.

The morning of March 22, 2005, plaintiff noticed a foul smell coming from the women's restroom. A short time later, Firefighter Amy Steffel Mandolfo told plaintiff she needed to air out the restroom and wanted to know if it was OK to leave the door open. Plaintiff asked her what was wrong, and Mandolfo said she had discovered a very large deposit of feces in the toilet, more than one individual would produce. Plaintiff commented to Mandolfo, "you know that that was meant for me." Mandolfo agreed. They reported the incident to Captain Charlie Winans.

By letter dated March 23, 2002, plaintiff officially complained of harassment to Fire Chief Paul Wagner, citing the March 20, 2002 conversation with Captain Hajek, the March 21, 2002 discussion involving Captain Hajek and Firefighter Garrett, and the condition of the women's restroom on the morning of March 22. She further advised that, on March 23, at shift change, she was in the kitchen exchanging keys with Captain Bergholz and discussing

-7-

a medical call they had the night before with a two-year-old child who was having trouble breathing. One of the "interrogating" officers from the "A" shift reportedly made the statement that "he was having problems with his kid and poop, a whole bunch of it." According to plaintiff, this officer "was grinning the whole time." Captain Winans and plaintiff subsequently brought the restroom incident to the attention of Captain Hajek, who said he would look into it.

The following Monday, Chief Wagner notified the Mayor, Omaha Personnel Director Cecil Hicks and Labor Relations Director Tom Marfisi of plaintiff's complaint. Wagner said he wanted the investigation to move forward in a timely manner and for the investigation to "be done properly to cover all bases." The Mayor fully supported the investigation and expressed a desire for strong disciplinary action to send a message that the City would not tolerate harassment. On March 28, Chief Wagner sent letters to the fire employees at plaintiff's station house, notifying them of the investigation and advising them that they could be disciplined or even terminated for violating the City's policy prohibiting harassment and intimidation. The employees were further advised that they could go to him directly, avoiding the chain of command, or go to the Labor Relations or Personnel Directors with any complaints of harassment.

In response to plaintiff's complaint, group interviews of the firefighters at the plaintiff's station house were conducted on March 29, 2002 and April 7, 2002. Firefighter Dale Hanna stated that he heard the conversation while sitting at the table reading the paper,

-8-

but he did not participate in the discussion.  Hanna admitted Captain Hajek's tone was loud, but that was his normal tone when talking.  Hanna said he did not hear any offensive language directed at the plaintiff and did not perceive the discussion as intimidating or offensive.  Amy Steffel Mandolfo was asked about the feces in the toilet.  She said she did perceive this incident as an attack on plaintiff in retaliation for her comments made at the City Council meeting.

The "A" shift firefighters were interviewed on April 7, 2002.  They all indicated the discussion between Hajek and plaintiff "was not at all interrogating or heated in nature." Witnesses to the discussion said that the incident was "not heated but opinions were stated." They said there was no plan to confront plaintiff or gang up on her because of her statements before the City Council.  The discussion was initiated when Hajek asked a question about the percentages plaintiff gave the City Council, which led to other questions asked by other members standing around the kitchen.  "There was no threatening or harassing behavior witnessed by those present during the discussion." Regarding the March 21, 2002 discussion between Hajek and Garrett, Hajek said there was a discussion about affirmative action between himself, Pace, and Garrett.  All three participants said the discussion was not heated or intimidating, but all three gave their opinions about affirmative action.

Hajek said he became aware of the feces left in the women's toilet the morning of March 23, 2002 when confronted by plaintiff and Captain Winans.  Hajek was later notified by Firefighter Pace that Pace was responsible for the incident because Pace was planning a

practical joke on Firefighter Justin Frost.[2]  Frost was intended to find the feces when he cleaned the women's restroom; however, Frost did not clean the bathroom that day and the mess was not discovered until the next morning by Amy Steffel Mandolfo.

The internal affairs report concluded the March 20, 2002 discussion was civil; the feces left in the toilet were "part of a practical joke gone badly"; and there were no witnesses to the "baby poop" comment.  The reporting officer did "not have sufficient evidence that shows clearly that Captain Brown was being harassed as stated in the City Personnel Policy."  "Reporting Officer is not saying that these incidents did not occur, but the evidence indicates a different set of events than those documented in Captain Brown's letter."

Meanwhile, at her request, plaintiff was transferred to from the "C" shift at Station 65 to the Fire Prevention Bureau, downtown station, effective April 1, 2002.  Apparently, this assignment required plaintiff to report to various stations throughout the City.

By letter dated May 1, 2002, plaintiff complained to Chief Wagner of continuing harassment.  This letter advised that on April 19, 2002, she was at a fire station reviewing fire codes.  The television was already on when she got there.  According to plaintiff, Firefighter James Lee came over and asked what she was watching.  Before she could reply, he took the remote control and tried to turn the television off.  When the remote control did not work, Lee reportedly told plaintiff that if she was going to watch TV, and he pays house dues for the cable she was watching, then she had better start paying the $3.00 house dues because

---

[2]It is common for male firefighters to use the women's restroom/locker room when there are no women assigned to the shift.

she was not going to watch any TV that he pays house dues for.  Captain Prestito heard the whole conversation and said nothing, and plaintiff felt that Prestito agreed with the firefighter.  Plaintiff said nothing, got up, and turned the television off.  On April 19, 2002, Lee reportedly interrupted a private conversation between plaintiff and another firefighter in the report room at Station 42.  Lee entered the room without asking if they minded and, according to plaintiff, acted like they did not have a right to have a private conversation in that room; he just sat at a computer doing nothing.  During his deposition, Firefighter Lee characterized the statements made in plaintiff's May 1 letter to Chief Wagner as "very inaccurate."  According to Lee, he asked her what she was watching, and he just let her know, "we pay $3 house fees every two weeks," and then he walked away.

In response to plaintiff's complaint concerning Firefighter Lee,  Personnel Director Hicks notified the Mayor, Fire Chief and Labor Relations Director that it was necessary to take steps to communicate that "uncivil" behavior would not be tolerated.  Hicks had received reports that over the last few weeks there were several incidents at various fire houses across the city as a result of the "heated debate" over the Affirmative Action Plan. The incidents involved, but were not limited to, purposely ignoring workplace questions, childish and inappropriate remarks, and unfair and inconsistent treatment in relation to policies and procedures.  The situations were escalating, thus creating a potential hostile environment for specific individuals or groups.  Hicks recommended: (1) a joint meeting with the Fire Chief, Union President, Law Department, Personnel Director and others to

-11-

discuss the volatility of the issue; (2) a briefing to Fire Management of the policy, stressing that unacceptable behaviors will not be tolerated from anyone; and (3) distribution of the Zero Tolerance Policy/Executive Order on Harassment by Fire Management to front line employees within 24 hours of briefing.

Fire Chief Wagner responded that he shared Hicks' concerns about the "potential volatility of uncivil behavior" that had occurred due to the heated debate over the Affirmative Action Plan. Wagner advised Hicks that he had initiated several actions to enforce the Mayor's Executive Order calling for "zero tolerance" for discrimination. In response to plaintiff's most recent complaint, Wagner discussed with his management team the policy and guidelines distributed in the Executive Order and the need for strict enforcement. He directed the training staff to coordinate the distribution of the Executive Order and have all officers review it with their firefighters, stressing strict compliance. The affirmative action plan and zero tolerance policy were incorporated into the training schedule. Wagner noted that the matter had been "a very difficult process to police," and he had been proactive in responding to specific letters of complaint; however, "Although both myself and my management staff have enthusiastically approached compliance with these executive orders, unfortunately, there have been these recent occurrences of challenge."

On April 18, 2002, plaintiff filed a charge of discrimination with the Nebraska Equal Opportunity Commission (NEOC) and EEOC concerning the two March 2002 incidents. On December 10, 2002, plaintiff wrote to the NEOC reporting additional harm she experienced

-12-

since the initial complaint.  Plaintiff stated that after she reported the March 2002 incidents, harassment from coworkers increased drastically.  She described the hostile work environment as "intolerable."  For example, on April 1, 2002, plaintiff went to Central Station to drop off paperwork. The facility had been locked down since 9/11. Firefighter Dan Patterson was sitting down reading.  When plaintiff knocked on the glass door, he looked up, saw it was her, and his demeanor turned to anger.  Patterson opened the door and looked at her with hatred.  Plaintiff stated she was afraid to walk past him.  He paced back and forth, continuing to stare at her without speaking.  That same day, Captain John Coniglio and plaintiff went to a standpipe test at New Style Apartments, but did not arrive until the test was completed.  Coniglio reportedly commented to Fire Inspector Jerry Anderson that he had missed everything.  Anderson responded that "yeah, you missed everything, but if you want me to redo it I will redo it for you and you only," implying that he would not do it for plaintiff.  Plaintiff stated she and Anderson previously had a cordial relationship.  After she reported the incident of April 19, 2002 at Station 42, persons with whom she had long working relationships no longer associated with her.  Whenever she needed to stop at a fire station for department business, she encountered hostility, rudeness, ostracism, and sometimes anger.  Every fire station was the same.  As soon as she walked into a room, everyone else would walk out.  Plaintiff expressed fear for her life, due to the nature of the job. She experienced depression and used the Employee Assistance Program, which referred her to a psychologist for treatment.  Even though plaintiff was placed on sick leave, her

-13-

symptoms increased.  She became more depressed, started having panic attacks, and avoided going out in public because she might meet someone from the department.[3]

In June 2002, plaintiff applied for a service-connected disability retirement pension for post traumatic stress disorder.  The application was denied in September 2002.

In late 2002, Acting Fire Chief Joseph Napravnik ordered mandatory company training on how to deal with harassment in the workplace, for all firefighters.  He ordered officer training for all Battalion Chiefs and Captains in December 2002.  In March 2003, he and Mayor Fahey attended a meeting of the Association of Black Firefighters, where many acknowledged their support of the plaintiff.

In July 2003, plaintiff filed another application for a service-connected disability. Upon reconsideration, the Police and Fire Retirement System Board of Trustees voted to grant plaintiff a non-service-connected disability pension; however, plaintiff had not requested that relief, and plaintiff declined to accept a non-service-connected disability retirement pension.

On August 23, 2003, plaintiff wrote to the Fire Chief complaining about actions and comments made by Captain Jeff Kalina on that date at Station 42 during "C" shift.  At 3 p.m. that day, plaintiff received a phone call from Firefighter Jana Pullium, who was "upset and disturbed" by the treatment and comments she heard from Kalina, who is an executive board member of the firefighter's union.   He was at the station, in uniform and on duty, to discuss

---

[3]These incidents were the subject of a second EEOC complaint filed on February 24, 2003.

the proposed union contract.  Everyone reported to the kitchen for the meeting, at which time Kalina told Pullium that since she was not a union member she should not be in the room.  She said she would not discuss anything, but the outcome affected her and she wanted to be informed.  Kalina told her she needed to leave.  Captain Mike Little also told her to leave.  Pullium left the room, but could hear everything that was said.  During the "union" meeting, Kalina told the others that the pension board hearing on August 21, 2003 had two no-shows: Captain Ray Costanzo was due to appear regarding a service connected disability pension, but when he found out that plaintiff was to appear that day, he canceled his appearance "because he did not want to be in the same room with her, or on the same docket with her." Kalina also told the others that plaintiff had canceled her appearance two hours before the board meeting because one of the members who voted for her last time would not be there.  The board member who did not show up did not want anything to do with Linda Brown again, so to avoid that, he didn't show up.  Kalina reportedly said that because of this, "Linda Brown contacted Jesse Jackson with PUSH and the Rainbow Coalition will be coming to Omaha to support Linda Brown and with all the black women he will be bringing with him you know what that means.  That means that we are going to get laid!"  Brown complained to the Fire Chief that Pulliam was harassed.  She wondered whether Kalina, as a Captain and Executive Board member of Firefighters Union Local 385, made this speech at every station.

The incident involving Kalina was investigated.  The Fire Chief replied to plaintiff on September 24, 2003, that fire personnel who were present on August 23, 2003 at Station

42 "were extensively interviewed and/or gave written statements.  The official disposition of your complaint is that it is not sustained.  There was not sufficient evidence to prove or disprove your allegations."

After the March 26 and April 7, 2002 interviews, Hicks consulted the Mayor and the Fire Chief.  The Mayor advised Chief Wagner that he wanted strong discipline imposed.  Hicks agreed that a 20 day suspension (twenty 24-hour shifts amounting to approximately 2 months) was appropriate for Captain Hajek and a three day suspension (three 24-hour shifts) was appropriate for Firefighter Pace.  On May 3, 2002, Chief Wagner sent letters to Hajek and Pace informing them that these periods of suspension would be imposed for "harassing and profane remarks" Hajek made on or about March 20, 2002 and for Pace's restroom incident.  The exact dates of suspension would be set at a later time.

Hajek filed a grievance, pursuant to the firefighters' union contract, and the matter of his suspension was heard before an arbitrator in accordance with the Collective Bargaining Agreement between the City of Omaha and the Professional Firefighters Association of Omaha, Local 385, International Association of Firefighters, AFL-CIO-CLC. (Filing 30-37).  The arbitrator reduced Hajek's suspension from 24 shifts to one shift, based on Hajek's 24-year record of "excellent" service.  The arbitrator characterized Hajek as a person who "made a mistake in judgment by confronting another Captain with inappropriate remarks in front of subordinates."  Pace's period of suspension was also reduced in arbitration.

-16-

## CONCLUSIONS OF LAW

Plaintiff seeks relief under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") and 42 U.S.C. § 1983, alleging that she was subjected to retaliatory harassment on the job by Caucasian male co-employees, that this conduct constituted a hostile work environment, and that the City failed to take reasonable action to stop the unlawful harassment, retaliation and hostile environment.

Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An unlawful employment practice is established "when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e(m).

### A.      Title VII - Hostile Environment

A plaintiff may establish a violation of Title VII by proving that discrimination based on race created a hostile or abusive work environment. "Title VII prohibits 'discriminatory harassment so severe or pervasive as to alter the conditions of employment and create a hostile working environment.'" *Mems v. City of St. Paul*, 224 F.3d 735, 738 (8th Cir. 2000) (quoting *Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir. 1999)).

> An employer creates a hostile work environment if: (1) the employee is a member of a protected group; (2) the employee is subjected to unwelcome

-17-

harassment; (3) a causal nexus exists between the employee's membership in the protected group and the harassment; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt and effective remedial action.

*Id.* The plaintiff must prove each of these elements to establish a *prima facie* case of racial discrimination based on a hostile work environment. *Tatum v. City of Berkeley*, 408 F.3d 543, 550 (8th Cir. 2005); *see also Robinson v. Valmont Indus.*, 238 F.3d 1045 (8th Cir. 2001).

Significantly, plaintiff makes no claim and has presented no evidence that any superior ranking officer or official participated in any incidents of harassment. Nor does she allege that she suffered any tangible adverse employment action (such as loss of salary, benefits, or promotion) as the result of her support of the affirmative action plan.

It is the position of the City of Omaha that, assuming[4] the plaintiff has met the first four elements of proof on her Title VII claim, the plaintiff has failed to demonstrate a material issue of fact as to whether the City failed to take prompt and effective remedial action. "Prompt remedial action shields an employer from liability when the harassing conduct is committed by a co-worker rather than by a supervisor." *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 994 (8th Cir. 2004).

---

[4]The City does not concede that these elements have been proven or that actionable harassment occurred.

-18-

In her brief (Filing 76), the plaintiff has also identified the dispositive issue as whether there is a material question of fact "as to whether the City of Omaha took reasonable and effective steps to correct a racially hostile atmosphere and discriminatory behavior in its Fire Department." Plaintiff contends that material issues of fact exist, citing

1. The long delayed and then almost nonexistent punishment of Captain Hajek,

2. The one day suspension of Firefighter Pace who does not believe his punishment is in any way related to the treatment of Linda Brown,

3. Amy Mandolfo's dramatic reversal of testimony[5] given to the City's investigator;

4. The testimony via affidavit from Linda Brown and another African American Firefighter that a hostile environment continues unabated at the Fire Department.[6]

Plaintiff's Brief, Filing 76, at page 6.

In assessing the reasonableness of an employer's remedial measures, the court considers "the temporal proximity between the notice and remedial action, the disciplinary or preventive measures taken, and whether the measures ended the harassment." *Meriwether*

---

[5]The initial internal affairs investigator reported that Mandolfo did interpret the incident as a message for the plaintiff. During her deposition, taken on April 12, 2005, Mandolfo testified that she could not clearly remember the details of the March 2002 toilet incident, or exactly what she said to the plaintiff at that time. She no longer agrees that the feces were left as a message for the plaintiff.

[6]Plaintiff and Mike Andrews have filed affidavits stating that they have "over the years encountered systematic and consistent discrimination against female and African American firefighters," and that female and African American firefighters work in a hostile work environment created by this discrimination. Plaintiff's affidavit concludes, "Before and after filing this lawsuit, I have encountered discrimination and a hostile work environment. I feel that city officials have not effectively reprimanded the offenders or have taken other effective steps to stop the harassment and hostile work environment."

-19-

*v. Caraustar Packaging Co.*, 326 F.3d at 994; *see also Robinson v. Valmont Indus.*, 238 F.3d at 1047.

In this case, the record shows that the City of Omaha, at all time relevant to this proceeding, had in place an Affirmative Action Plan or an Executive Order requiring fair treatment of minorities and females as city employees.  The City Personnel Director spoke in favor of the revised Affirmative Action Plan on March 19, 2002.  (Filing 30-31).  The Omaha Mayor adopted a zero tolerance policy regarding harassment and discrimination. (Filing 30-7).  The Standard Operating Procedures of the Omaha Fire Department also include a policy against discrimination and harassment. (Filing 30-19).

Plaintiff complained to Chief Wagner by letter dated March 23, 2002 of the incidents which occurred March 20-23, 2002.  On Monday morning, March 25, 2002, Wagner initiated an internal investigation of plaintiff's complaints.  Wagner involved Labor Relations Director Tom Marfisi, Personnel Director Cecil Hicks, and Fire Department internal affairs personnel, in the investigation. Chief Wagner specifically advised the Directors that he wanted the investigation to move forward "in a timely manner" and to be "done properly to cover all bases."  On March 28, 2002, letters were sent by Chief Wagner to fire employees at plaintiff's station house notifying them of the investigation and reminding them that they could be disciplined or even terminated for violating the City policy prohibiting harassment, and intimidation.  The letter also reminded the employees that they could go to him directly (and avoid the chain of command) or go to the Labor Relations or Personnel Directors with any

-20-

complaints of harassment.  The Mayor fully supported the investigation and expressed his desire for strong disciplinary action to send a message that the City would not tolerate harassment.

On March 29, 2004, Marfisi began the investigation with a group interview, including the firefighters on Plaintiff's shift ("C" shift) (Steffel, Winans, Hanna, Renner, Mancuso and plaintiff).  On April 9, 2002, the "A" shift firefighters (Hajek, Garrett and Pace) were interviewed.

After the internal investigation was completed, the Mayor, the Fire Chief and the Personnel Director collectively determined that Captain Hajek, had, in fact, harassed the plaintiff during their March 20, 2002 conversation. Chief Wagner imposed the maximum suspension of 20 working days against firefighter Hajek.  This discipline was reduced by an arbitrator, in a proceeding mandated by a collective bargaining agreement, to a one-day suspension.

Pace was also disciplined for his pivotal role in fouling the women's restroom. According to Marfisi, had there been any evidence that the prank was in any way connected to the plaintiff, Pace would have been terminated, not suspended.  Giving the plaintiff the benefit of all inferences, the evidence proffered at the time of the investigation and now undisputed, shows: (a) plaintiff and firefighter Steffel/Mandolfo *believe* that the feces were left to send a message to the plaintiff; and (b) they *believe* that maybe more than one person left the feces.  Plaintiff never saw the feces. Pace admits that he left the feces on the morning

-21-

of March 21, 2002, because he intended to play a practical joke on his friend Justin Frost, who was assigned to clean the bathroom on March 21, 2002. The plaintiff was not assigned, and did not work that day. Pace testified that no one else was involved in the prank, and no evidence has been produced to dispute this testimony. Amy Mandolfo was assigned to clean the women's bathroom on the "C" Shift. The record is devoid of evidence that anyone expected plaintiff to clean the bathroom or to find Pace's deposit more than 24 hours after it was left.

In response to plaintiff's complaints, Chief Wagner and his successor, Joe Napravnik, initiated the following actions to address harassment: (a) Wagner met with the fire management team and discussed the City's zero tolerance policy and the need to "strictly enforce" it; (b) Wagner directed the training staff to distribute the Executive Order on zero tolerance, and to discuss with the trainees; (c) at the direction of the Fire Chief, the zero tolerance policy was incorporated into the monthly school and in the training Bulletin; (d) Napravnik ordered mandatory company training on dealing with harassment in the workplace, for all firefighters except inspectors; and (e) Napravnik ordered officer training for all Battalion Chiefs and Captains in December 2002.

The City and Fire Department also accommodated the plaintiff in several respects, immediately granting her request to transfer from Station 65 to a position in the Fire Prevention Bureau and moving her parking spot from the station where Lee worked to another firehouse. On April 30, 2002, after Lee's comments about TV dues, plaintiff went

on sick leave and remained on paid leave for approximately five months. When she returned to work, plaintiff was permitted to forgo otherwise mandatory training because of her anxiety.

Turning to the four matters quoted above that plaintiff argues constitute material issues of fact, the plaintiff basically claims that the City did not impose enough discipline on Hajeck and Pace. City officials, in fact, imposed a maximum suspension on Hajek and a substantial suspension on Pace. The reductions of their suspensions were the results of decisions made by an arbitrator through the appeal process afforded firefighters under the collective bargaining agreement.

The record shows that City officials promptly investigated each of plaintiff's complaints and took remedial action in the forms of substantial internal investigations, notices, training, and disciplinary action. Although the affidavits filed by plaintiff and Andrews make the conclusory assertion that female and African American firefighters continue to work in a hostile work environment created by discrimination, the plaintiff has not cited or produced any evidence of any incident of discrimination or harassment that was not thoroughly investigated by the City. The firefighters who were disciplined have not had further contact with the plaintiff. I note that plaintiff's August 23, 2003 complaint against Captain Jeff Kalina did not involve any conduct committed against or witnessed by the plaintiff. In any event, the matter was investigated at plaintiff's request.[7] After an extensive

_____

[7]The complaint was made in response to information plaintiff received from Firefighter Jana Pulliam. No evidence was presented regarding Pulliam's actual testimony, statements, or role in this investigation.

investigation, the complaint against Kalina was not sustained because there was not sufficient evidence to prove or disprove plaintiff's allegations. The fact that the discipline the City imposed on Hajek and Pace was reduced in arbitration does not mandate the conclusion that the City failed to take prompt  and effective remedial action.  *See Mikels v. City of Durham*, 183 F.3d 323, 330-31 (4th Cir. 1999) (city took prompt and adequate remedial measures to relieve it of liability under Title VII, despite assistant city manager's subsequent action reducing sanctions against male officer accused of harassment).

I find, as a matter of law, that the City of Omaha took prompt remedial action in response to plaintiff's complaints.  The City is, therefore, shielded from liability under Title VII on plaintiff's hostile environment claim.

## B.   Title VII - Retaliation

The plaintiff contends her co-employees harassed her in retaliation for speaking out in favor of affirmative action and for filing complaints of discrimination.  To establish a *prima facie* case of retaliation under Title VII, the plaintiff must show that she "engaged in protected conduct, that [s]he suffered an adverse employment action, and that the adverse action was causally linked to the protected conduct." *Griffith v. City of Des Moines*, 387 F.3d 733, 735 (8th Cir. 2004).   "'An adverse employment action is exhibited by a *material* employment disadvantage, such as a change in salary, benefits, or responsibilities." *Meyers v. Starke*, 420 F.3d 738 (8th Cir. 2005) (quoting *Bradley v. Widnall*, 232 F.3d 626, 632 (8th Cir. 2000) (emphasis in original)).

-24-

While the plaintiff certainly engaged in protected conduct, there is absolutely no evidence in this record that the City, through its officials or supervisors, ever took any adverse employment action against the Plaintiff.  For that reason, summary judgment must be granted in favor of the City on plaintiff's claim for retaliation.

**C.   Section 1983**

The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

The theory of liability in a § 1983 employment discrimination claim is that discrimination on the basis of race, sex, religion, or exercise of First Amendment rights constitutes a deprivation of equal protection and, thus, violates the fourteenth amendment to the U.S. Constitution.

A municipality may be sued directly, as a "person" under 42 U.S.C. § 1983, but the liability of a municipality is strictly limited.  *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Under *Monell*, a municipality may not be held liable for violations of § 1983 through the doctrine of *respondeat superior*.  Municipal governments can be held liable for the acts of their employees in contravention of individuals' civil rights "only upon a showing that a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" is the motivating force behind the acts of those

-25-

employees. *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 223 (8th Cir. 1994); *see also Artis v. Francis Howell N. Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1181 (8th Cir. 1998).

To prevail on her § 1983 claim, the plaintiff must prove that the City had an official policy or widespread custom that violated the law and caused her injury. All the evidence is to the contrary. As a matter of law, given the information on the record, no reasonable factfinder could conclude that there was any policy or custom on the part of the City of Omaha to treat African-American or female employees any differently than Caucasian male employees are treated. Absent a finding that there was a policy or custom, the City cannot be held liable to the plaintiff under § 1983.

## CONCLUSION

For the reasons discussed above, and viewing the facts and inferences in the light most favorable to the plaintiff, the court finds there is no genuine issue as to any material fact and defendant is entitled to a judgment as a matter of law on all of plaintiff's remaining claims.

**IT THEREFORE IS ORDERED** that defendant's Motion for Summary Judgment (Filing 29) is granted. Pursuant to Fed. R. Civ. P. 58, Judgment will be entered contemporaneously in accordance with this Memorandum and Order.

**DATED November 3, 2005.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**

-26-